**DATAGATE, INC., Plaintiff–Appellant,**

v.

**HEWLETT–PACKARD CO., Defendant–Appellee.**

No. 93–17276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 1995.

Decided July 27, 1995.

W. Ruel Walker, San Francisco, CA, and Francis O. Scarpulla, San Francisco, CA, for plaintiff-appellant.

Kurt W. Melchior, Alison S. Hightower, Nossaman, Guthner, Knox & Elliot, San Francisco, CA, and Robert A. Skitol, James A. Myers, Penelope M. Lister Farano, Drinker Biddle & Reath, Washington, DC, for defendant-appellee.

Before: GOODWIN, SCHROEDER and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

We consider whether a tying arrangement foreclosing a single customer can ever affect a "not insubstantial" volume of commerce and so be illegal *per se* under the Sherman Act, § 1 (15 U.S.C. § 1). Datagate, Inc. appeals the district court's order granting summary judgment in favor of Hewlett–Packard Company ("HP") on Datagate's claim that HP imposed illegal tying arrangements on its customers. The district court held that Datagate had presented evidence sufficient to establish a material issue of fact as to only a single tying arrangement, affecting one customer, and that this was insufficient as a matter of law to affect a "not insubstantial" amount of commerce under *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984). We have jurisdiction over Datagate's timely appeal, 28 U.S.C. § 1291, and we reverse.

## I

Datagate is an independent service organization ("ISO") which engages in the mainte-

nance and repair of HP computer equipment ("hardware service"). HP competes with Datagate and other ISOs in the market for the provision of hardware service. HP also provides support services for the proprietary operating systems and applications software which are necessary to operate its computer equipment ("software service"). The provision of software service requires the use of HP's proprietary materials.

Datagate sued HP alleging numerous violations of the antitrust laws arising from HP's conduct in the hardware service market. The district court granted summary judgment for HP on all Datagate's claims. We affirmed in part, reversed in part and remanded. *Datagate, Inc. v. Hewlett–Packard Co.*, 941 F.2d 864 (9th Cir.1991) ("*Datagate I*"), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). We remanded two of Datagate's claims to the district court: One alleging that HP had illegally imposed tying arrangements on its customers, in violation of the Sherman Act, § 1, by refusing to provide software service unless the customers also purchased hardware service from HP, and a second claim for injunctive relief under the Clayton Act, § 16 (15 U.S.C. § 26).

On remand, Datagate abandoned the claim for injunctive relief. HP again moved for summary judgment on the tie-in claim, and Datagate requested and received two continuances for further discovery on that claim. For the purposes of the summary judgment motion, the parties entered into the following stipulation: "assuming arguendo the existence of separate markets for software service and hardware service for HP minicomputers, defendant [HP] had market power in the tying product (software service) and there was a substantial volume of commerce in the tied product (hardware service)." The district court then granted summary judgment for HP.

The district court determined that the uncontroverted evidence in the record was sufficient to create a triable issue of fact as to whether HP had imposed a tying arrangement on Rockwell International ("Rockwell"), one of its customers. The court further determined that Datagate's evidence failed to establish a triable issue of fact as to the existence of any additional tying arrangements allegedly imposed by HP. Quoting from *Jefferson Parish*, the district court held that a tying arrangement imposed on only a single customer was insufficient as a matter of law to support Datagate's tie-in claim: "If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560.

Datagate appeals.

## II

■ We review *de novo* the district court's order granting summary judgment. *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir.1995).

## III

The district court interpreted *Jefferson Parish* to mean that, as a matter of law, a tying arrangement imposed on a single customer is always *de minimis*, and not of concern to the antitrust laws. The district court read *Jefferson Parish* too broadly.

### A

A tying arrangement is a device used by a competitor with market power in one market (for the "tying" product) to extend its market power into an entirely distinct market (for the "tied" product). To accomplish this, the competitor agrees to sell the tying product (here software service) only on the condition that its customers also purchase the tied product (in this case hardware service). The competitor thus uses its market power in the tying product to coerce the customer into purchasing the tied product. This is one of the few practices that the Supreme Court has determined to be illegal *per se* under the Sherman Act, § 1. *See Jefferson Parish*, 466 U.S. at 9–10, 104 S.Ct. at 1556–57.

■ Three elements must be satisfied to establish that a tying arrangement is illegal *per se:* (1) a tie-in between two products or services sold in different markets, (2) market power in the tying product, and (3) the tying

arrangement affects a not insubstantial volume of commerce. *Bhan v. NME Hosps. Inc.*, 929 F.2d 1404, 1411 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). For the purposes of the summary judgment motion, the parties unquestionably stipulated to the second element: HP's market power in the tying product.

The parties dispute exactly which of the other elements is at issue in this appeal. Datagate argues that the third element is at issue: whether a "not insubstantial" volume of commerce was affected by HP's single alleged tying arrangement. While continuing to press its argument under *Jefferson Parish*, HP contends that the parties stipulated to the third element, and that the *Jefferson Parish* analysis either goes to the first element of whether HP imposed a tie-in at all, or creates a fourth requirement of multiple tying arrangements.

▪ First, the parties did not stipulate to the third element. Although the district court stated that the parties stipulated that "a tying arrangement imposed by HP would affect a substantial volume of commerce in the tied market," that is not what the parties' stipulation says. The parties simply stipulated that there *was* a substantial volume of commerce in the tied market, not that any tie-in by HP would affect a substantial volume. At oral argument, HP declined to concede that any tying arrangement it might have imposed would have affected a not insubstantial amount of commerce. Thus, the parties' stipulation establishes only the second element.

Second, the crucial language from *Jefferson Parish* goes to the "not insubstantial" requirement, rather than bearing in some way on the first element, or creating an entirely new element, as HP urges. The dispositive issue in *Jefferson Parish* was whether the defendant had market power, and thus whether it could effectively impose a tying arrangement. *See* 466 U.S. at 26, 104 S.Ct. at 1565–66. The "single purchaser" language relied upon by the district court and HP appeared in a section of the opinion discussing the background of *per se* liability for tie-ins:

Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify *per se* condemnation. If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby. (citing cases)

*Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560. One of the cases the Court cited in the above passage was *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501–02, 89 S.Ct. 1252, 1257–58, 22 L.Ed.2d 495 (1969) (*"Fortner I"*). The cited pages from *Fortner I* concern *only* the meaning of the "not insubstantial" requirement. *Id.* In context, it cannot seriously be questioned that the *Jefferson Parish* Court was discussing the same requirement.

We must determine whether Datagate brought forth enough evidence to create a disputed issue of material fact regarding the first and third elements.

### B

▪ Whichever element is involved, HP argues that a tying arrangement foreclosing only one purchaser can never be *per se* illegal. Construing HP's argument to be that a tying arrangement affecting only a single purchaser is insubstantial as a matter of law, we disagree.

We agree with Datagate that the Supreme Court did not intend the above-quoted language from *Jefferson Parish* to create a "single purchaser" rule of general applicability. The Court's statement must be read in conjunction with the facts of the case, which involved the market for anesthesiology services. *See Jefferson Parish*, 466 U.S. at 22, 104 S.Ct. at 1563. The foreclosure of a single purchaser in that market (*i.e.* one patient in a single surgical procedure) would involve only several hundred dollars. Again, the Court's citation to *Fortner I* is helpful. In that case, the Court explained at some length

the meaning of the "not insubstantial" requirement:

> The requirement that a "not insubstantial" amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie.... An analysis of market shares might become relevant if it were alleged that an apparently small dollar-volume of business actually represented a substantial part of the sales for which competitors were bidding. But normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie....

*Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1257–58. Read with reference to *Fortner I*, the Court's statement in *Jefferson Parish* means simply that, on the facts of that case, where a single purchaser represented neither a substantial dollar-volume nor a substantial portion of the relevant market, the foreclosure of a single sale would be *de minimis*.

A broader reading of the Court's statement would be unwarranted, and would lead to aberrant results. Under HP's interpretation, a tying arrangement forcing a single sale worth millions of dollars would be perfectly legal, while an identical arrangement forcing multiple sales worth many times less would be subject to *per se* condemnation. We do not believe this is the rule that the Court intended.

HP's reliance on *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir.1984), *cert. denied*, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985) is misplaced. That case did not hold, as HP states, that *Jefferson Parish* imposed a threshold "single purchaser" rule. The issue decided by *Digidyne* was whether the "not insubstantial" element included a requirement that a substantial portion of the market in the tied product be affected. *See id.* at 1341. Relying on the above-quoted passage from *Fortner I*, we concluded that such a showing was not required. *Id.* It was undisputed in *Digidyne* that multiple purchasers were involved; that case is not controlling here.

■ The remainder of HP's argument on this issue, analogizing to cases involving antitrust standing, misses the point.[1] HP contends that the "single purchaser" rule is required in order to ensure that only tie-ins with substantial anticompetitive effects in the relevant market are proscribed. Such is not the law. The foundational principle of *per se* antitrust liability is that some acts are considered so inherently anticompetitive that no examination of their impact on the market as a whole is required. *See Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1258. The requirement in the cases that a tie-in must be more than *de minimis* should be rigorously distinguished from any supposed requirement that an otherwise *per se* illegal tying arrangement must have a substantial impact on any given market in order to be actionable. *See Digidyne*, 734 F.2d at 1341.

We hold that *Jefferson Parish* does not impose a "multiple purchaser" requirement of general applicability. The "not insubstantial" requirement can be satisfied by the foreclosure of a single purchaser, so long as the purchaser represents a "not insubstantial" dollar-volume of sales.

## IV

■ Applying this rule to the evidence in the record, we conclude Datagate has brought forth enough evidence that Rockwell represented a "not insubstantial" dollar-volume of hardware service sales to survive summary judgment.

In opposition to summary judgment, Datagate submitted the declaration of its president that the Rockwell hardware service contract at issue was worth approximately $100,000 per year. HP does not argue that this *dollar-volume* is insubstantial, concentrating instead on its single purchaser theory.

1. Datagate's standing to sue under the antitrust laws is not at issue in this appeal. HP did not contend before the district court that Datagate had not suffered causal antitrust injury. Unlike Article III standing, the question of standing to sue under the antitrust laws does not go to subject matter jurisdiction, and thus need not be considered *sua sponte*. *See Rebel Oil*, 51 F.3d at 1433 (question of causal antitrust injury goes to scope of protection afforded by antitrust laws).

This amount is sufficient. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir.1977) ("The 'not insubstantial' test has been met by showing dollar volumes which total $60,800, and estimated sales of $86,376." (citations omitted)). Even adjusting these holdings for inflation, a dollar volume of $100,000 per year for an unspecified number of years would hardly be *de minimis.*

## V

■ HP argues that the evidence in the record is insufficient to establish even the single Rockwell tying arrangement. We disagree. It is common ground that, on summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Rebel Oil,* 51 F.3d at 1432.

■ The "essential characteristic" of a *per se* illegal tying arrangement is that the seller makes use of its market power in the tying product to coerce the buyer to purchase the tied product. *Jefferson Parish,* 466 U.S. at 12–13, 104 S.Ct. at 1558; *see also Datagate I,* 941 F.2d at 870 (seller must have "coerced to some extent the purchaser into buying the tied product." (citation omitted)).

■ Datagate submitted to the district court the deposition testimony of Robert Buckner, a Rockwell employee responsible for the procurement of hardware services on HP equipment owned by Rockwell. Buckner testified that, in late 1985 or early 1986, he spoke to two HP employees who told him that HP would not provide software service if Rockwell purchased hardware service from a third party. Buckner also testified, when asked what "impact" HP's refusal to provide software service would have on Datagate's ability to win Rockwell's hardware service contract, that "[Rockwell] could not afford to do without our software maintenance." Finally, Datagate's president declared that Datagate's prices for hardware maintenance were significantly below HP's.

Read in the light most favorable to Datagate, this uncontroverted evidence is sufficient to establish a disputed issue of material fact as to whether HP imposed a coercive tying arrangement on Rockwell. It can readily be inferred from Buckner's testimony that HP's threat to withhold software service precluded Rockwell from considering other providers of hardware service. Buckner's testimony also indicates that, although he had reservations, he was interested in purchasing hardware service from a provider other than HP until he learned that HP would refuse to provide software service. Finally, the fact that Datagate's prices for hardware service were lower than HP's supports the inference that HP's threats to some extent coerced Rockwell into making a purchase from HP it would not have made on the open market. *See Jefferson Parish,* 466 U.S. at 14–15, 104 S.Ct. at 1559–60 (explaining that the primary harm from tying arrangements is the impairment of competition on the merits in the market for the tied product).

HP argues that the allegation in Datagate's complaint that HP "retreated" from its tie-in position constitutes an admission which undermines Datagate's claim. HP is incorrect. That HP eventually stopped tying software services to the purchase of hardware services does not defeat any claim Datagate may have against HP based on purchases foreclosed during the period HP allegedly did have a tie-in policy. For the same reason, HP is not helped by Buckner's deposition testimony that, several months after two HP employees told him of the tie-in policy and Rockwell entered a hardware service contract with HP, a different HP employee told him that there was no such policy. That testimony is consistent with a change in HP policy, after the tying arrangement had already coerced Rockwell into purchasing hardware services from HP.

■ HP argues that Datagate failed to present sufficient evidence of a "contract, combination ... or conspiracy" to survive summary judgment under *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). HP misconstrues the application of *Monsanto* to tie-in cases. HP is correct that, under *Monsanto* and the plain language of the Sherman Act, a "contract, combination ... or conspiracy" in restraint of trade is required to establish a violation of § 1. 15 U.S.C. § 1; *Mon-*

*santo,* 465 U.S. at 761, 104 S.Ct. at 1469. What HP fails to recognize is that the "contract" requirement is satisfied in tie-in cases by the coerced *sales contract* for the tied item. *See Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 191–92 (2d Cir.1992) ("A tying arrangement is 'an *agreement* by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'") (citations omitted, emphasis added). A showing that the buyer of the tied product was coerced by the tying arrangement into making the purchase is sufficient to show that the buyer was not merely "acting independently." *See Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471.

This is illustrated by the Fourth Circuit's decision in *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680 (4th Cir.1992), upon which HP relies. In that case, the plaintiff alleged that the defendant computer manufacturer's policy of licensing diagnostic software only to users that serviced their own equipment was an illegal tie-in between the software and repair services. *Id.* at 682–83. The court cited extensively to *Monsanto* in holding that the plaintiff had not made out a tie-in claim. *Id.* at 685–86. However, the court's holding was founded on its determination that there was no evidence that the defendant had ever conditioned the sale of the software upon the purchase of its repair services. *Id.* at 686. In other words, the defendant had never forced anyone to buy the tied product. What *Monsanto* requires is evidence of a coerced agreement to purchase the tied product. *See id.* at 685 & n. 11. Datagate has brought forth sufficient evidence of such a tie-in to survive summary judgment.

HP's reference to unilateral refusal to deal cases similarly misses the point. HP relies heavily on a footnote in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). There, the Supreme Court stated: "Assuming, *arguendo,* that Kodak's refusal to sell

parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not." *Id.* at 463 n. 8, 112 S.Ct. at 2080 n. 8. This simply means that, for the purposes of tie-in analysis, the defendant may sell the tying product to anybody or nobody at all. What it may not do is *condition* the sale of the tying product upon the purchase of the tied product, thereby expanding its market power into the market for the tied product. The harm from tying arrangements is the forced sale of the *tied* product, not the withholding of the tying product. HP does not argue that it had some legitimate policy of unilaterally refusing to sell software services to certain parties. *Kodak* does not help HP.

Finally, HP's "law of the case" argument is meritless. In refusing to reconsider its original pre-remand summary judgment order, the district court commented that Buckner's testimony was "insignificant" and "not enough to show coercion in this context." These comments went to the determination of whether HP's conduct had a large enough impact on the hardware service market to be anticompetitive under a rule of reason analysis. *See Datagate I,* 941 F.2d at 868–69 (discussing antitrust standing). As discussed above, if HP's conduct was *per se* illegal, it was also *per se* anticompetitive. At the time the district court made the observations quoted by HP, it had already dismissed Datagate's tie-in cause of action for failure to state a claim. The court's comments, made on summary judgment, could not be a dispositive ruling on a legal issue not before it.

Despite HP's persistent attempts to obfuscate the applicable legal standards, we hold that Datagate presented evidence sufficient to create a factual dispute as to whether HP coerced Rockwell into purchasing its hardware services by threatening to withhold software services.[2]

---

2. Datagate argues that, even if there is a "multiple purchaser" requirement, it presented evidence sufficient to create a disputed issue of material fact regarding more than a single tying arrangement. As we have concluded that Data-gate's tie-in claim survives summary judgment on the basis of the disputed issues of material fact concerning the alleged Rockwell tying arrangement, we need not address Datagate's alternative argument.

## VI

We conclude that *Jefferson Parish* does not create a "single purchaser" rule of general applicability. There are disputed issues of material fact that preclude summary judgment for HP. The judgment of the district court is REVERSED and the case is REMANDED to that court for further proceedings consistent with this opinion.